816 F.2d 678
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Mildred BERNIER, Administratrix of the estate of George
Radovich, deceased, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 85-4058.
 United States Court of Appeals, Sixth Circuit.
 April 14, 1987.
 
 N.D.Ohio
 AFFIRMED.
 On Appeal from the United States District Court for the Northern District of Ohio.
 Before RYAN, BOGGS, Circuit Judges, and BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff, Bernier, appeals the magistrate's judgment in favor of the United States, in this medical malpractice-wrongful death action brought under the Federal Tort Claims Act. The only issue is whether the magistrate's findings of fact were clearly erroneous because defendants' experts were impeached during cross-examination, making them not credible. We affirm the judgment.
 
 I.
 
 2
 Plaintiff is the administratrix of the estate of George Radovich, who died December 8, 1981, while a prisoner at the Springfield, Missouri, Medical Center. The Radovich family had lived in Monoca, Pennsylvania, until 1974. In 1974, Mr. Radovich, who was suspected of embezzlement, fled with his wife to Findlay, Ohio, where they assumed the names of Les and Caroline Draper. Mr. Radovich then began working as a hypnotist. Mr. and Mrs. Radovich used the Draper name until Mr. Radovich's arrest in 1981 for failure to file income tax returns and filing false income tax returns. Radovich pled guilty to those charges and was sentenced to three years imprisonment on September 18, 1981. Due to his chronic obstructive pulmonary disease (COPD) Radovich was incarcerated at the Medical Center. COPD is a progressive and incurable disease.
 
 
 3
 Upon being admitted to the Medical Center on November 6, 1981, Radovich was evaluted by a nurse. According to the nursing notes, Radovich arrived short of breath although he had stated that he was "okay." His vital signs were taken at that time.
 
 
 4
 Dr. Lieberwitz saw Radovich on November 9, three days after his arrival at the Center. Dr. Lieberwitz conducted a physical examination and performed pulmonary function and arterial blood gas studies. He diagnosed COPD and sinus tachycardia, and prescribed appropriate medication. He also prescribed oxygen at one liter, strictly on an as-needed basis. Dr. Lieberwitz told Radovich on several occasions not to spend time in his wheelchair, because COPD patients who remain sedentary increase their risk of a pulmonary embolism.
 
 
 5
 There are several entries in the nurses' notes concerning Radovich. Although the nurses observed Radovich daily on each of their shifts, including an initial observation at the onset of each shift, and subsequent observations during and at the end of each shift, notes were made concerning chronic-care patients, such as Radovich, only on an "as-needed" basis. Plaintiff points to the scarcity of nursing notes as indicative of infrequency of observation of Radovich by members of the nursing staff. The government responds that the lack of nursing notes does not reflect a lack of contact between the patient and the nursing staff; rather it merely reflects the Medical Center's policy to record nurses' notes in the record only as needed. Radovich's vital signs were not generally taken. On assessing his condition, the nurses relied on his skin color, signs of labored breathing, statements by Radovich, and any other observable indications of respiratory distress.
 
 
 6
 Radovich had a severe episode of respiratory distress on November 29 and 30. On the 29th he was given oxygen because he received no relief from his bronchodialator. Forty-five minutes later, Radovich was resting quietly. In the early afternoon, however, Radovich again complained of being unable to breathe. Within ten minutes a physician was notified, medication was prescribed, and Radovich recovered from his distress.
 
 
 7
 Radovich's next period of respiratory distress occurred December 7. At about 3:00 p.m., Radovich was using oxygen and breathing into a brown paper bag. His pulse and breathing rates were noted, as were his breathing sounds. Because he had not taken his medication the preceding day the nurse instructed Radovich to take his medication. She told Radovich that use of the brown paper bag would worsen his symptoms and took the bag away. At 6:00 p.m., Nurse Jackson went to Radovich's room because he still had not reported for medication. She observed Radovich breathing into the brown paper bag again and using the oxygen at 4 1/2 liters. Once again the nurse took the brown paper bag away, and, because Radovich had been prescribed one liter of oxygen, and only as absolutely needed, the nurse turned the oxygen off from 4 1/2 liters. Radovich complained that he was unable to take his oral medication because, due to his shortness of breath, he could not swallow. A half hour later he was again using the brown paper bag and again refusing to take his oral medication because of shortness of breath. The nurse instructed him to breathe more slowly and to use the pursed lips breathing method. The nurse told him to tell her when he would be able to take his medicine. Later in the evening the nurse observed Radovich sleeping. Shortly thereafter, Radovich awoke with forced and labored respiration. Later in the evening Radovich was observed sleeping, and his respiration was easy. At 10:00 p.m. Radovich refused his oral medication again because of shortness of breath. Shortly after midnight Radovich was observed lying on his left side with shallow but not labored respiration. At 1:20 a.m. Radovich was found dead.
 
 
 8
 Plaintiff's expert witnesses testified that both the nursing and medical care given by defendant failed to satisfy the standards of practice for the care and treatment of chronic COPD patients. Plaintiff's experts believed that Radovich's conduct did not contribute to his death, and in their view, the only cause of Radovich's death was the unaggressive, inadequate care given him by the Medical Center personnel. They opined that Radovich had a lengthy life expectancy.
 
 
 9
 Defendant's experts, on the other hand, testified that the course of treatment of Radovich met all reasonable standards, and evidenced no neglect on the part of either the nursing or medical staff. They also opined that even had there been negligence, such neglect did not proximately cause Radovich's death, because no treatment by defendant could have prevented Radovich's death, which was impending because of his end-stage COPD. These experts also testified that Radovich accelerated his demise by failing to take his medications, failing to participate in his respiratory therapy, being sedentary when he was told to be active, taking oxygen at 4 1/2 liters rather than 1 liter, breathing into a brown paper bag, and otherwise failing to abide by the doctor's and nurses' instructions. These experts testified Radovich's life expectancy was between a matter of days and six to eight months because of his end-stage COPD.
 
 
 10
 Upon reviewing the evidence, the magistrate gave greater weight to the testimony of defendant's experts, Drs. Kvale, Dr. Horton, and Nurse Kopacz, because of the extent and quality of their experience with patients having COPD. The magistrate found that the plaintiff's experts, although experienced in their own areas of expertise, had less experience both qualitatively and quantitatively with COPD patients such as Radovich. The magistrate specifically stated; "[T]o be weighed against this assessment of the overall weight to be given to the various experts, in view of the nature and extent of their experience with patients similar to Mr. Radovich, are the difficulties each of the [defendants'] three principal experts had during intense and thorough cross-examination...." The magistrate determined that the discrepancies which appeared to exist between the witnesses' depositions and their courtroom testimony were shown either to be immaterial or were adequately explained.
 
 
 11
 After declaring that he assigned greater weight to the testimony of defendant's expert witnesses than to that of the plaintiff's, and after weighing the effect of the plaintiff's efforts to impeach the defendant's witnesses, the magistrate made the following conclusions: 1) defendant was not negligent; (2) even if negligent, such negligence did not contribute to Radovich's death; (3) Radovich had a very short life expectancy, not to exceed his sentence of incarceration, and therefore plaintiff lost no consortium; (4) any pain and suffering prior to Radovich's death was not caused by defendant, but was rather caused by his medical condition; and, because Radovich died in his sleep, he suffered no pain at the time of his death; and (5) decedent was contributorally negligent by refusing to follow doctor's instructions and by attempting to manipulate his symptoms in an attempt to "aggravate his symptoms so that he could enhance the prospects for a favorable ruling on the Rule 35 motion" which would have afforded Radovich an early release from incarceration.
 
 II.
 
 12
 Plaintiff does not allege that the magistrate's verdict was clearly erroneous because of a lack of evidence supporting the findings of fact; rather, plaintiff claims the magistrate committed clear error by giving greater weight to defendant's expert witnesses than to plaintiff's expert witnesses, particularly in light of the impeachment evidence. To support her argument the magistrate should not have given great weight to the conclusions of defendant's experts, plaintiff points to the following impeachment evidence: The government did not produce Dr. Lieberwitz as an expert witness to testify at trial, but introduced his deposition instead; Dr. Lieberwitz perjured himself during his deposition; Nurse Jackson testified falsely concerning her prior employment at Cox Hospital; Nurse Kopacz's testimony is contradicted by the medical charts which show only a few sparse and sketchy nursing notes; Kopacz is repeatedly impeached with her own prior deposition testimony; Dr. Horton viewed testimony as "a form of intellectual chess" and was impeached during cross-examination by use of his prior deposition testimony; and Dr. Kvale's testimony was inconsistent with Dr. Horton's testimony as to what medical efforts could have been done to help Mr. Radovich. Plaintiff also asserts the depositions of Horton and Kopacz can be read as implying defendants were negligent, and that their negligence caused Radovich's death.
 
 
 13
 In his written findings of fact and conclusions of law, the magistrate found that the impeachment of all the witnesses during cross-exaimination was either immaterial or adequately explained by the witnesses on redirect. He concluded, for example, that despite believing that Dr. Lieberwitz
 
 
 14
 "clearly was not forthcoming, and, in fact, testified falsely regarding his criminal record ... these circumstances are, they are not, in the context of this case, material to the findings of fact I am called upon to make."
 
 
 15
 and
 
 
 16
 "[M]y doubts about the doctor's honesty do not influence my decision on the question of whether or not he was negligent. Certainly his own opinion in that regard is not material or persuasive, and is not a basis for my finding in this case."
 
 
 17
 This court's review of the fact-finder's findings is that of clear error. "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). A reviewing court cannot reverse the finder of facts simply because it would have decided the case differently. Anderson v. City of Bessemer City, 470 U.S. 564 (1985).
 
 
 18
 "If the district court's account of the evidence is plausible ... the court of appeals may not reverse it even though ... it would have weighed the evidence differently.
 
 
 19
 ...
 
 
 20
 "[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."
 
 
 21
 Id. at 528, 529-30. The trial judge is uniquely able to determine the credibility of witnesses and weigh the evidence to arrive at the facts. Id. See also Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844 (1982). In this case the magistrate chose to give greater weight to the defendant's expert witnesses because their experience was qualitatively and quantitatively superior to plaintiff's expert witnesses' experience. His decision to credit the testimony of defendant's witnesses was not clear error. The witnesses testified defendant was not negligent, decedent was contributorally negligent, and defendant's acts did not contribute to decedent's impending death.
 
 
 22
 Because the magistrate committed no clear error, we AFFIRM.